UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| CB&I AREVA MOX Services, LLC, | Case No. 1:18-52-TLW |
| Plaintiff, | **COMPLAINT** |
| v. | (Jury Trial Requested) |
| Flanders Corporation, | |
| Defendant. | |

Plaintiff CB&I AREVA MOX Services, LLC ("MOX Services"), formerly known as Shaw AREVA MOX Services, LLC, through its undersigned counsel, files its Complaint against Defendant Flanders Corporation ("Flanders") (collectively MOX Services and Flanders may be referred to as the "Parties") and hereby states as follows:

## THE PARTIES AND JURISDICTION

1. Plaintiff, MOX Services, is a limited liability company with its principal place of business located in Aiken, South Carolina.

2. Defendant Flanders, upon information and belief, is a corporation incorporated in and with a principal place of business in North Carolina.

3. Upon information and belief, Flanders is a wholly-owned subsidiary of American Air Filter Company Inc., which is a Delaware corporation with its principal place of business in Louisville, Kentucky.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 due to the parties' complete diversity of citizenship and an amount in controversy in excess of $75,000.00.

5. Venue is proper pursuant to the forum-selection clause of the Agreement (defined below) between the Parties, and Flanders has consented to jurisdiction in this forum.

6. MOX Services respectfully requests that its claims be heard by a jury.

## FACTUAL BACKGROUND

7. MOX Services is the prime contractor for the mixed oxide fuel facility being constructed at the Savannah River Site outside of Aiken, South Carolina (the "Project").

8. On or about February 9, 2009, the Parties entered into Subcontract No. 10888-B-2767, Task Order Release ("TOR") No. 1 KCB – Homogenization, Sampling and Filling, KCC – Canning Unit, and NBX/NBY Primary Blend & Scrap Milling Unit ("TOR 001" or "the Agreement").[1]

9. Amongst other things, TOR 001 was for the fabrication and delivery of two nuclear gloveboxes NBX and NBY ("Gloveboxes") for use in the Project.

10. In addition to TOR 001, MOX Services also awarded to Flanders B-2767 Task Order Release No. 2 ("TOR 002"), B-2767 Task Order Release No. 3 ("TOR 003"), and B-2767 Task Order Release No. 5 ("TOR 005") on or about September 21, 2009.

11. Shortly after TOR 001 was executed, it became apparent that Flanders was unable to satisfactorily perform the work. During performance of TOR 001, MOX Services repeatedly expressed concerns to Flanders about its deficiencies during weekly Project Status Meetings. Those concerns included Flanders' lack of necessary and appropriate equipment and labor resources, including hiring a requisite number of qualified welders, to successfully perform the work scope for TOR 001. In addition, MOX Services repeatedly expressed concerns to Flanders regarding Flanders' failure to timely transmit the necessary technical documentation that conformed to the requirements of the Agreement. Flanders also repeatedly missed its

---

[1] At the time of contracting, MOX Services was operating under its prior name of Shaw AREVA MOX Services, LLC and Flanders was operating under its prior name of Flanders CSC.

- 2 -

performance deadlines, which constantly called into question its ability to provide adequate and timely performance of TOR 001.

12. Despite MOX Services' notifications to Flanders regarding its deficiencies in performance, inadequate performance continued on multiple TORs, and the lack of improvement compelled MOX Services to issue a letter of concern to Flanders on or around January 12, 2010 – less than a year into the contract performance.

13. The January 12, 2010 letter of concern discussed Flanders' inability to make meaningful progress on the work and the overall delay that it was causing the project, and also expressed general doubts over Flanders' ability to complete TOR 001.

14. Regarding Flanders' inadequate performance on TOR 001, MOX Services followed up with additional letters of concern on April 29, 2010 and August 26, 2010.

15. To the extent MOX Services was able to evaluate the work performed by Flanders, numerous obvious defects and issues were detected, which necessitated the generation of multiple Non-Conformance Reports ("NCR") that required remediation for the work to be brought into conformance with the stringent nuclear standards of the Project.

16. Due to inadequate performance and the defective work that generated the NCRs mentioned above, MOX Services issued a show cause notice on September 21, 2010. The show cause notice demanded that Flanders explain and remedy its poor performance, and notified Flanders that MOX Services was considering terminating certain TOR's for default.

17. After evaluating Flanders response to the show cause notice and evaluating Flanders' defective work on the Gloveboxes and overall lack of progress, on or about February 24, 2011, in accordance with Subcontract Section E, paragraphs 1.25 and 1.34, MOX Services

notified Flanders that it was de-scoping all remaining work on TORs 002, 003, 005, effective immediately.

18. Despite the delay in the work by Flanders on TOR 001, MOX Services determined that the most cost-effective action at the time was to allow Flanders to complete TOR 001 and to have Flanders ship the Gloveboxes with the known deficiencies, which were documented in a list of NCRs.

19. Flanders eventually delivered the Gloveboxes to MOX Services. NBX was delivered to MOX Services on September 18, 2012, and NBY was delivered on October 10, 2012.

20. Upon evaluating the delivered Gloveboxes, in addition to the workmanship deficiencies that had already been documented by the NCRs, MOX Services discovered additional defects regarding the size and depth of certain short-arc welds on the NBX and NBY Gloveboxes, whereby Flanders had used a welding technique that was unauthorized for the thickness of material involved. Due to the short-arc weld defects, on or about November 12, 2012, as required by NRC regulation, MOX Services issued NCRs on the defective short-arc welds, notifying Flanders of this issue.

21. On or about January 7, 2014, as memorialized in the Modification of Subcontract/Agreement, Modification 16, the parties negotiated a final settlement to resolve all issues known at that time related to the NBX and NBY Gloveboxes. The settlement agreement essentially de-scoped all remaining work, which included all necessary known rework pursuant to TOR 001.

22. The settlement was limited in scope and embodied only the settlement of the known issues identified in Modification 16 to TOR 001 and the related NCRs that had been

issued to Flanders. Specifically, Section 10.2 of Modification 16 stated that MOX Services was accepting the Gloveboxes in the "as is" condition only as it pertained to the known defective welds identified in the list of NCRs attached to Modification 16.

23. Furthermore, to remove all doubt, Modification 16, Section 10.2 (c) explicitly excluded from the settlement any and all **latent defects**. Flanders agreed to "[r]emain responsible for any and all latent defects discovered in the delivered equipment in accordance with the warranty provisions of the subcontract as identified in Section E, paragraph 1.12 . . ."

24. To repair the Gloveboxes delivered by Flanders, MOX Services identified a new contractor to repair and complete the work on the Gloveboxes. As a result, MOX Services contracted with Petersen, Inc. ("Petersen") to repair the short-arc welds on the NBX and NBY Gloveboxes in order to make them suitable for use in the Project.

25. During repair of the short-arc welds on the Gloveboxes, on or about March 15, 2015, Petersen discovered and reported the presence of fluid in the Gloveboxes' tube steel as non-conforming by-products of Flanders' original work. The tube steel welds and associated fluids in the tube steel were not related to the short-arc weld deficiencies being repaired by Petersen.

26. In addition, the fluid was determined to contain contaminants not allowed to be present during welding operations, indicating that Flanders had not maintained required cleanliness controls during fabrication.

27. These significant and latent non-conformances were not disclosed by Flanders prior to or after the execution of Modification 16 and significantly expanded the scope of repair and rework required by MOX Services for the NBX and NBY Gloveboxes.

28.     Flanders failed to disclose to MOX Services the liquid contaminants and the other deficiencies in fabrication leading to the contamination, and MOX Services could not have discovered these defects other than through destructive, invasive, and rigorous testing.

29.     MOX Services could not have known the defects related to the hidden fluid and contaminants in the tube steel at the time of acceptance of the Gloveboxes, nor at the time of execution of Modification 16.  The fluid and contaminants were hidden from knowledge as well as from sight and could not have been discovered by the exercise of reasonable care.

30.     Due to the potential of having contaminants in the vicinity of most structural-weld, heat affected zones, MOX Services determined it necessary to conduct a metallurgical examination through additional sampling of the NBX and NBY tube steel welds to obtain reasonable assurance that the welds could perform their design function.

31.     On or about March 15, 2015, soon after discovery of the liquid contaminants, MOX Services notified Flanders of these latent defects for the Gloveboxes and requested Flanders to provide information as to the content and source of the liquid contaminants to potentially minimize the cost of destructive testing and repairs, and notified Flanders of a potential warranty claim.

32.     On or about September 8, 2015, MOX Services provided further notice to Flanders of the ongoing investigations into the defective work by Flanders.

33.     Flanders failed to properly respond to MOX Services' inquiries, thus requiring MOX Services to undergo comprehensive testing to evaluate the impact of the liquid contaminants without the valuable input from Flanders – the culprit of this newly discovered latent defect.

34. Due to the lack of response, on or about March 23, 2016, MOX Services demanded that Flanders respond on the warranty deficiencies and initiate discussions on reimbursing MOX Services for the costs to remedy the defective work.

35. On or about April 5, 2016, Flanders responded with the intention of evaluating the information and to meet with MOX Services on the additional findings.

36. Despite Modification 16 specifically excepting latent defects from the settlement and Flanders' ongoing obligations to MOX Services, Flanders has refused to honor those obligations and pay for the remediation of the latent defects.

37. After significant evaluation and deliberation, MOX Services concluded that removal of the welds as part of the sampling process would severely damage the structure of the Gloveboxes. Therefore, the Gloveboxes will have to undergo extensive repair, or be refabricated in their entirety.

38. Since the time MOX Services was forced to de-scope TOR 001, MOX Services has been damaged by the unintended costs due to defects that were not disclosed by Flanders. These costs include labor, materials and resources to conduct testing and evaluation of the condition of the Gloveboxes delivered by Flanders.

39. In exchange for the work performed on TOR 001, MOX Services paid Flanders in excess of $1.6 million for the NBX/NBY Gloveboxes. As the Gloveboxes must now be extensively repaired, or scrapped and completely rebuilt, due to Flanders' defective work, MOX is entitled to recover the costs incurred in testing and evaluating the defective Gloveboxes as well as the cost to reprocure the Gloveboxes.

40. MOX Services must also undergo the expense of procuring and administering the replacement contractor to perform the work of TOR 001 and reconstruct the Gloveboxes. These

administrative costs and those related to MOX Services' activities in evaluation and testing of the Gloveboxes are also a direct consequence of Flanders' failure to perform its obligations under TOR 001 and are recoverable by MOX Services.

41. Based on the contamination issues with the NBX/NBY Gloveboxes' tube steel, MOX Services began evaluating and investigating all of the other gloveboxes constructed by Flanders with tube steel welds. Pursuant to MOX Services conducting an "extent of condition review" of all gloveboxes constructed by Flanders, it was discovered that glovebox KCB – Homogenization, Sampling and Filling Unit had similar contaminants in its tube steel and that a repair is required.  As a result, Flanders is responsible for the costs of the investigations, the repair to KCB, and any additional defects yet to be determined. The full extent of the damages caused by Flanders' defective work has not yet been fully determined.

## FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

42. MOX Services incorporates by reference the foregoing Paragraphs as if the same are set forth herein at length.

43. The Agreement and Modification 16 thereto, *inter alia*, constitute the contract between the Parties.

44. During Flanders' course of performance on the Project, Flanders materially breached multiple provisions of the parties' Agreement, including, but not limited to Section E, paragraphs 1.12, 1.15, 1.16, 1.18, 1.25, 1.34 and the incorporated FAR provision 52.249.2, codified at C.F.R. § 52.249-2, and otherwise failed to fully and timely perform its obligations and duties under TOR 001.

45. Due to the latent defects, MOX Services is now required to engage in the re-procurement process for extensively repairing or reconstructing the Gloveboxes anew.

46. In addition to the additional costs of completing the work through other vendors, MOX Services was required to expend labor and administrative expenses that would not have been necessary had Flanders not breached its contract.

47. All conditions precedent to MOX Services' claims for relief have been performed and/or excused.

48. As a direct and proximate result of Flanders' breaches of TOR 001, MOX Services has sustained and continues to sustain significant damages in an amount to be determined at trial.

### FOR A SECOND CAUSE OF ACTION
### (Breach of Warranty)

49. The allegations of paragraphs one (1) through forty-one (41) not inconsistent herewith are hereby realleged as fully and effectively as if set forth herein verbatim.

50. Under TOR 001, Section E, paragraph 1.12, Flanders expressly warranted that the Gloveboxes delivered would be in strict conformity to the standards and requirements in accordance with the requirements of TOR 001.

51. Furthermore, under Modification 16, Section 10.2(c), Flanders further agreed that these warranty responsibilities survive for "any and all latent defects discovered in the delivered equipment in accordance with the warranty provisions of the subcontract as identified in Section E, paragraph 1.12 . . ."

52. MOX Services relied upon these warranties in its negotiation with Flanders.

53. In addition to its duties under the Agreement, Flanders had a legal duty to fabricate the Gloveboxes in conformance with the provisions of 10 C.F.R. § Pt. 50, App. B and NQA-1.

54. Because of the latent defects of fluid and contaminants in the tube steel, the Gloveboxes are not suitable or fit for their intended use.

55. Flanders is in breach of the warranty and its legal duty regarding fabrication quality.

56. MOX Services did not discover, become aware, nor could it have become aware, of the breach by Flanders until after March 2015.

57. MOX Services notified Flanders of this breach repeatedly soon after its discovery.

58. Under TOR 001, Flanders was obligated to effectuate the repair and/or replacement of the defective work at its own expense, or pay to MOX Services an amount to correct the defects.

59. Flanders' breach was the proximate cause of the damages incurred by MOX Services as set forth above.

60. To date, Flanders has failed and refused to effectuate the replacement and/or repair, and has not paid MOX Services an amount to correct the defective work and thus is required to compensate MOX Services for the amounts it will incur to remedy the defective work.

NOW THEREFORE, MOX Services respectfully requests that this Court grant judgment in favor of MOX Services and against Flanders; award MOX Services monetary damages in an amount in excess of $75,000.00, the full amount to be determined at trial, plus costs, interest, punitive damages, and attorneys' fees; and grant any further relief that this Court deems just and proper.

Respectfully submitted,

By: s/ Nekki Shutt
Nekki Shutt (Federal I.D. No. 6530)
Kathleen McDaniel (Federal I.D. No. 10139)
BURNETTE SHUTT & MCDANIEL, PA
PO Box 1929
Columbia, South Carolina 29202
(803)850-0912
nshutt@burnetteshutt.law
kmcdaniel@burnetteshutt.law

Columbia South Carolina
January 5, 2018

Ericson P. Kimbel (PA ID No. 85074)
Tania Wang (PA ID No. 318013)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
412-288-3388
ekimbel@reedsmith.com
twang@reedsmith.com

*Motion for Admission Pro Hac Vice (to be filed imminently)*

**ATTORNEYS FOR PLAINTIFF CB&I AREVA MOX SERVICES, LLC**